1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

17

| | |
|---|---|
| TAMMY BUSBY, | Case No. 1:17-cv-00050-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | |
| Defendant. | (Doc. 1) |
| _____/ | |

18

## I.    INTRODUCTION

19

20

21

22

23

24

On January 11, 2017, Plaintiff Tammy Busby ("Plaintiff") filed a complaint under 42 U.S.C. §§405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") benefits.  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

25

26

27

28

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on February 27, 2017).  She is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7, 8.)

## II.    BACKGROUND

On May 22, 2013, Plaintiff protectively filed an application for SSI, alleging that she became disabled on May 1, 2003, due to mood disorder, anxiety disorder, bipolar disorder, depression, suicidal and violent ideation, angry outbursts, isolation from others, nightmares and problems sleeping, racing thoughts, and lost interest. (Administrative Record ("AR") 137, 159.) Plaintiff was 47 years old when she filed the application. (AR 17, 137 (listing Plaintiff's date of birth as September 6, 1965).) Plaintiff completed the eighth grade, and she has not held employment in at least the past ten years. (AR 33, 160.)

### A.    Relevant Medical Evidence[3]

#### 1.    Fresno County Department of Behavioral Health

On February 12, 2013, Plaintiff presented at Fresno County Mental Health, where she had been receiving mental health treatment, and was evaluated by Paul Snider, M.D. (AR 341.) Plaintiff complained of paranoid thoughts, mood swings, and sleep problems, and stated she had lost her job as a caregiver due to her symptoms. (AR 341.) Dr. Snider noted that Plaintiff was unable to obtain one of her medications from her medical assistance program because it was unavailable, but that Plaintiff had agreed to take the available medication. (AR 341.) Dr. Snider noted that Plaintiff had no security issues at the time, appeared well groomed, was cooperative, alert, organized in her thought processes, and had normal thought content. (AR 341.) Plaintiff's mood was depressed, elated, and anxious. (AR 341.) Dr. Snider diagnosed Plaintiff with "bipolar disorder, most recent episode mixed, severe with psychotic features," and alcohol abuse. (AR 341.) Dr. Snider assessed that Plaintiff's symptoms had worsened with medication. (AR 341.)

On June 17, 2013, Plaintiff presented in a depressed and violent state. (AR 339.) Plaintiff had been experiencing depression lasting up to four or five days, and she had two violent episodes "arguing with her own thoughts and having suicidal and homicidal thoughts." (AR 339.) Plaintiff complained that the increased dosage of one of her medications had caused

---

[3] As Plaintiff's assertions of error are limited to the ALJ's discrediting of the medical opinion of Lance Portnoff, Ph.D., and the lay witness testimony of Plaintiff's mother and aunt, only evidence relevant to those arguments is set forth below.

dizziness. (AR 339.) Dr. Snider noted that Plaintiff was suicidal, homicidal, and was experiencing delusions and hallucinations. (AR 339.) Plaintiff's mood was depressed, elated, and anxious. (AR 339.) Dr. Snider assessed that Plaintiff's symptoms had worsened with medication, and adjusted her medications. (AR 339.)

On June 24, 2013, Plaintiff reported that she was no longer experiencing mood swings since her medications were adjusted. (AR 337.) Plaintiff also was no longer experiencing violent episodes, or thoughts of homicide and suicide. (AR 337.) Dr. Snider continued Plaintiff on the current medication regime. (AR 337.)

On August 15, 2013, Plaintiff reported continued medication compliance, but that she was experiencing insomnia. (AR 353.) John Schaeffer, D.O. noted that Plaintiff's "response to medication change" had worsened, but that Plaintiff's "response to medication and lab results" had improved. (AR 353.) A mental status examination revealed that Plaintiff's thought content varied from normal to delusions, hallucinations, suicide and homicide. (AR 353.) Her mood was depressed, elated, and anxious. (AR 353.) Dr. Schaeffer noted that Plaintiff had rapid cycling bipolar disorder, and transferred her care from the Fresno Department of Behavioral Health to Turning Point for ongoing treatment. (AR 354.)

**2.     Turning Point of Central California**

On August 19, 2013, Plaintiff established care at Turning Point of Central California. (AR 414.) At that time, it was noted that Plaintiff did "not require specialty psychiatric care for maintaining adequate functioning." (AR 414.) Plaintiff returned on August 23, 2013, and reported that she was suffering insomnia because she had run out of her medication three days earlier. (AR 411.) Plaintiff further reported that the medication had effectively improved her symptoms related to insomnia, mood swings, and violent behavior. (AR 411.) The examining physical therapist assisted Plaintiff with obtaining refills, and instructed Plaintiff "to not wait for refills until last pill or after she runs out, but to come in [one week] . . . before running out." (AR 411.) On September 6, 2013, October 4, 2013, and October 11, 2013, Plaintiff reported that the medications had effectively controlled her symptoms, and that she had not been experiencing any symptoms or side effects since her last visit. (AR 404, 406, 409.)

October 28, 2013, Plaintiff underwent an initial psychiatric evaluation with Brian Mozaffari, M.D. (AR 399.) Plaintiff reported that she had run out of three of her four medications because she could not afford the refills, and that, as a result, she had begun hearing voices for the first time in months, and her mood swings had grown erratic. (AR 399.) Plaintiff stated that when experiencing depression, she sleeps four to five hours a night, has poor concentration, violent thoughts, and variable appetite and energy. (AR 399.) During her manic episodes, Plaintiff hears voices and experiences insomnia, racing thoughts, grinding jaw, and impulsive behavior. (AR 399.) Plaintiff informed Dr. Mozaffari that she had a history of violence and that she had been previously diagnosed with bipolar disorder. (AR 400.) She stated that, ten to fifteen years ago, she was hospitalized following a suicide attempt, and that she last attempted suicide six years ago. (AR 400.) Dr. Mozaffari diagnosed Plaintiff with "Bipolar I Disorder, Most Recent Episode, Severe Without Psychotic Features," and he altered her medication regime. (AR 401-02.)

On November 25, 2013, Plaintiff returned for a follow-up examination. She reported that the medication made her feel numb, but that "it's better than having mood swings." (AR 456.) Plaintiff denied having any problems with sleep, concentration, energy, or hopelessness. (AR 456.) Dr. Mozaffari assessed Plaintiff's behavior as cooperative and polite, her thought process as organized, congruent, and logical, and her thought content as lacking delusional thoughts. (AR 457.) Dr. Mozaffari adjusted the dosage of one of her medications. (AR 457.)

On December 23, 2013, Plaintiff complained of depression and diminished appetite. (AR 453.) However, Plaintiff also reported "feeling better, no longer having problems with sleep, [or] energy," and walking "for fun" once a day. (AR 453.) Dr. Mozaffari assessed Plaintiff's behavior as cooperative and polite, her thought process as organized, congruent, and logical, and her thought content as lacking delusional thoughts. (AR 454.) At Plaintiff's request, Dr. Mozaffari again adjusted her medication regime. (AR 453.)

On February 25, 2014, Plaintiff complained that her mood and thoughts were "out of control," and that she had thought of hurting people who hurt her in the past. (AR 450.) Plaintiff also admitted that she had stopped taking one of her medications "because it wasn't working."

(AR 450.)  Plaintiff was having no problems with sleep or energy.  (AR 450.)  Dr. Mozaffari assessed Plaintiff's behavior as cooperative and polite, her thought process as organized, congruent, and logical, and her thought content as lacking delusional thoughts.  (AR 451.)  Dr. Mozaffari prescribed alternate medications and referred Plaintiff to counseling. (AR 451.)

On March 17, 2014, Plaintiff reported that she complied with her medication regime and that she had been "feeling great" for the past two weeks.  (AR 447.)  Plaintiff complained that her mood began to decline the previous day.  (AR 447.)  Plaintiff denied having problems sleeping, thoughts of harming people, impulsivity, or racing thoughts.  (AR 447.)  Dr. Mozaffari assessed Plaintiff's behavior as cooperative and polite, her thought process as organized, congruent, and logical, and her thought content as lacking delusional thoughts.  (AR 448.)  Dr. Mozaffari increased Plaintiff's dosage of trazodone.  (AR 448.)

On April 28, 2014, Dr. Mozaffari's treatment notes state that, despite Plaintiff's reported compliance with medication, Plaintiff was hospitalized after hearing voices and having thoughts of harming herself and others.  (AR 444.)  Plaintiff's medications were altered during her hospitalization. (AR 444.)  Plaintiff reported to Dr. Mozaffari that the medications were helping her mood.  (AR 444.)  Dr. Mozaffari noted that Plaintiff was agitated, but that she was cooperative, her thought process was organized, congruent, and logical, and her thought content was lacking delusional thoughts.  (AR 444.)

On May 27, 2014, Plaintiff complained of continued lethargy and decreased appetite. (AR 440.)  Dr. Mozaffari noted that Plaintiff had failed to undergo the laboratory tests he previously ordered to assess hyponatremia related to lethargy.  (AR 440.)  Plaintiff reported that she was feeling less depressed and agitated, and that the medications were "working well."  (AR 440.)  Dr. Mozaffari's mental status examination revealed psychomotor agitation, but that Plaintiff's behavior was cooperative, her thought process was organized, congruent, and logical, and her thought content was lacking delusional thoughts.  (AR 440.)

On September 22, 2014, Plaintiff reported that she had again failed to undergo laboratory tests to assess hyponatremia related to lethargy, but that she was no longer experiencing lethargy. (AR 436.)  Plaintiff also admitted that she had one relapse in her alcohol recovery.  (AR 436.)

Plaintiff stated that she was no longer experiencing suicidal thoughts, and that she was feeling better.  (AR 436.)  She reported that her mood was well controlled with the current medications.  (AR 436.)

On October 9, 2014, Plaintiff was evaluated by a psychologist, Elizabeth Mouavangsou, MFTI, M.S., Psy.D., for re-authorization to continue obtaining mental health services.  (AR 432.)  Plaintiff reported a history of worthlessness, anxiety, poor appetite, insomnia, racing and violent thoughts three to four times per week, mood swings two to three times per week, hearing voices once every two weeks, and seizures once or twice weekly.  (AR 432.)  Plaintiff also reported that she does not take her medications, and that she had not reported this to her primary care physician.  (AR 432.)  Dr. Mouavangsou observed that Plaintiff was oriented, cooperative, and responsive, but that she was also anxious, as evidenced by her pressured speech and fidgeting.  (AR 432.)  Dr. Mouavangsou noted a diagnosis of "Bipolar 1 Disorder, Most Recent Episode Mixed, Severe With Psychotic Features.  (AR 433.)  Plaintiff's prognosis was "fair."  (AR 432.)  Dr. Mouavangsou referred Plaintiff for individual therapy four times per week for one year and five visits per week with a case manager.  (AR 433.)

On December 22, 2014, Plaintiff returned to Dr. Mozaffari, complaining of problems with her son.  (AR 421.)  Plaintiff reported running out of one of her medications, and that the medication had adequately improved her mood.  (AR 421.)  Dr. Mozaffari assessed Plaintiff's behavior as cooperative, her thought process as organized, congruent, and logical, her thought content as lacking delusional thoughts, and her mood as "okay."  (AR 421.)

On February 23, 2015, Plaintiff complained of experiencing depression lasting one week.  (AR 417.)  Plaintiff stated that she had been taking her medications, and that she had not experienced any major stressors or triggers.  (AR 417.)  Dr. Mozaffari noted that Plaintiff's description of her depression was vague.  (AR 417.)  Plaintiff was also vague when describing her typical day.  (AR 417.)  Dr. Mozaffari learned at that time that Plaintiff was applying for SSI.  (AR 417.)  Dr. Mozaffari noted that, in the time he has been treating Plaintiff, "she has exhibited little motivation to help her situation."  (AR 418.)  He then noted that "malingering needs to be ruled out."  (AR 418.)

### 3.    Lance Portnoff, Ph.D.

In February 2012, Plaintiff underwent a consultative examination with Lance Portnoff, Ph.D., in connection with her prior application for SSI.[4]  (AR 310-14.)  Plaintiff reported that she lived with her mother and spent a typical day isolating herself in her room at home.  (AR 311.)  Plaintiff stated that she needed no assistance with self-care, meal preparation, or housekeeping, but that she could not shop alone or manage money.  (AR 311.)  Plaintiff complained of depression, isolation, angry outbursts, and racing thoughts.  (AR 310.)  Plaintiff denied hallucinations or active suicidal ideation.  (AR 312.)

Dr. Portnoff initially observed that Plaintiff maintained adequate concentration, persistence, and pace, showed adequate insight, and made fair eye contact.  (AR 312.)  A mental status examination revealed a depressed mood, moderate psychomotor tension, and inadequate social judgment.  (AR 312.)  Plaintiff was unable to perform simple math calculations.  (AR 313.)  Dr. Portnoff diagnosed Plaintiff with "Bipolar Disorder, Moderate-to-Severe, rapid Cycling with serious symptoms," polysubstance dependence in reported sustained full remission, and a learning disorder.  (AR 313.)

With regard to Plaintiff's functional capacity, Dr. Portnoff opined that Plaintiff could perform simple and repetitive tasks.  (AR 313.)  Dr. Portnoff noted that Plaintiff had moderate limitations in her ability to perform detailed and complex tasks, accept instructions from supervisors, work on a consistent basis without special or additional instruction, and deal with the stress encountered in a competitive work environment.  (AR 313-14.)  Finally, Dr. Portnoff opined that Plaintiff had marked limitations in her ability to interact with coworkers and the public due to a mood disorder, maintain regular attendance in the workplace due to episodes of acute mania, and complete a normal workday without interruptions from a psychiatric condition.  (AR 314.)

### 4.    State Agency Psychologists

On August 24, 2013, Harvey Bilik, Psy.D., a non-examining state agency psychologist,

---

[4] Plaintiff previously applied for SSI, and the application was denied.  (*See* AR 48, 49, 75-78, 126-34, 135-36.)

reviewed Plaintiff's record and assessed her residual functional capacity ("RFC").[5] He found that Plaintiff suffered severe affective disorder. (AR 55.) Dr. Bilik noted that Plaintiff's mood and other symptoms were generally stabilized with treatment. (AR 55.) Dr. Bilik found that Plaintiff had moderate difficulty with concentration, persistence, pace and social functioning, and that she would be moderately limited performing activities within a schedule, maintaining regular attendance, and being punctual. (AR 55, 58.) Dr. Bilik also determined that Plaintiff would be moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. (AR 58.) However, Dr. Bilik found that Plaintiff "can adapt" and "can interact appropriately with others, but may benefit from reduced interactions with the public." (AR 59.) Dr. Bilik further found that Plaintiff could carry out simple and some detailed instructions, but perhaps not complex instructions over the course of a normal workweek. (AR 59.)

On November 15, 2013, Uwe Jacobs, Ph.D., endorsed and affirmed Dr. Bilk's opinion. (AR 67, 71.) Dr. Jacobs found that Plaintiff had moderate difficulty with concentration, persistence, pace and social functioning, and that she would be moderately limited performing activities within a schedule, maintaining regular attendance, and being punctual. (AR 70.) Dr. Jacobs found that Plaintiff "can interact appropriately with others, but may benefit from reduced interactions with the public." (AR 71.) Dr. Jacobs further found that Plaintiff could carry out simple and some detailed instructions, but perhaps not complex instructions over the course of a normal workweek. (AR 70.)

**B.    Third Party Statements**

On July 18, 2013, Plaintiff's mother, Eva Rodriguez, completed a third party adult function report. (AR 217.) Ms. Rodriguez reported that Plaintiff experiences mood swings, depression, anger, and violent outbursts, and that her symptoms have worsened over the past six

---

[5] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

months.  (AR 217.)  Plaintiff has difficulty coping with stress and with a change of routine.  (AR 223.)  Plaintiff has difficult interacting with anyone except Ms. Rodriguez and Plaintiff's minor son.  (AR 222.)  Ms. Rodriguez also reported that Plaintiff cannot focus, loses interest quickly, and is often restless.  (AR 221.)  Plaintiff often wears the same clothes for days and does not bathe.  (AR 218.)

Ms. Rodriguez reported that she provides care and support for Plaintiff.  For instance, she and Plaintiff's minor son prepare meals for Plaintiff because Plaintiff forgets to turn off the stove and oven.  (AR 219.)  Ms. Rodriguez also dispenses Plaintiff's medicine.  (AR 219.)

On January 24, 2015, Plaintiff's aunt, Shirley Mitchell, submitted a witness letter.  (AR 258.)  Ms. Mitchell described a change in Plaintiff's mental health following Plaintiff's "years of drug and alcohol abuse."  (AR 258.)  She stated that doctors diagnosed Plaintiff with bipolar disorder.  (AR 258.)  Ms. Mitchell reported that Plaintiff often does not brush her teeth, bath, or change her clothes.  (AR 258.)  Plaintiff cannot remember to take her medication, and she does not understand how to pay bills or handle money.  (AR 258-59.)  Ms. Mitchell stated that Plaintiff often exhibits rage and a lack of control, and that she is incapable of holding a job.  (AR 259.)

**C.    Administrative Proceedings**

The Commissioner denied Plaintiff's application for SSI initially on August 29, 2013, and again on reconsideration on November 18, 2013.  (AR 79-83, 88-93.)  Consequently, on December 18, 2013, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 94.)  At the hearing on April 23, 2015, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions.  (AR 9; *see generally* AR 29-47.)  At the hearing, Plaintiff also amended her alleged disability onset date to May 22, 2013—the date she filed her SSI application.  (AR 31.)

**1.    Plaintiff's Testimony**

Plaintiff testified that she suffers from depression, suicidal ideation, nightmares, violent thoughts, and racing thoughts.  (AR 35-36.)  She has a history of using alcohol and methamphetamine, but that she is now sober.  (AR 39.)  Plaintiff described experiencing the following symptoms as a result of her depression and her depression medications: lack of

appetite, loss of hope, inability to focus, sensitivity to noise and crowds, black-outs, seizures, and dizziness.  (AR 36-38, 41-42.)  Plaintiff testified that typically, during the bad times, her depression persists for up to five days, and her violent thoughts persist for up to one day.  (AR 36.)  She experiences dizziness every day, any time she is on her feet.  (AR 41-42.)  When Plaintiff has too much contact with others, she experiences an increase in her violent and racing thoughts.  (AR 40, 42.)  She can concentrate for up to one hour at most, and then needs to sleep.  (AR 40.)

With regard to treatment, Plaintiff was taking Proxitane, trazodone, Geodon, and Oxycontin.  (AR 38.)  Plaintiff testified that the medications had not improved her symptoms, and that she was experiencing dizziness as a side effect.  (AR 38.)  Plaintiff was receiving regular treatment from a psychiatrist, which helped improve her symptoms, but she has since been transferred to a new psychiatrist.  (AR 39.)

Plaintiff lives with her minor son, and only drives during daytime.  (AR 32.)  With regard to her daily activities, Plaintiff testified that she dresses herself, washes dishes, and cooks using the microwave and the stove, but she does not shop for groceries, participate in social activities, or manage her money and bills.  (AR 33-34, 37.)  On a good day, Plaintiff wakes at 6:30 a.m., showers, walks to her mother's home, visits with her other children who live with her mother, walks back home, and lies in bed for the remainder of the day.  (AR 34, 42.)  On a bad day, Plaintiff does not leave her home, does not eat, and does not watch television.  (AR 34-35.)  She remains in bed with the covers over her head.  (AR 34-35.)

**2.**     **Vocational Expert's Testimony**

A Vocational Expert ("VE") testified at the hearing, as well.  Since Plaintiff had no past work, the ALJ asked the VE whether a hypothetical person of Plaintiff's age and education could perform any work if such a person had no exertional limitations, but was limited to simple and some detailed (but not complex) tasks, and occasional public contact.  (AR 43.)  The VE testified that such a person could perform the following jobs: (1) janitor or cleaner, Dictionary of Operational Titles ("DOT") code 381.687-018, which was medium work, with a specific vocational preparation ("SVP") of 2, for which there exists 1,168,388 jobs nationally; (2)

landscape specialist, DOT code 406.687-010, which was medium work, with an SVP of 2, for which there exists 120,061 jobs nationally; and (3) cleaner II, DOT 919.687-014, which was medium work, for which there exists 163,771 jobs nationally. (AR 44.)

The ALJ asked the VE a second hypothetical question considering the same person outlined in the first hypothetical, who had no exertional limitations, but was limited to simple, routine tasks, occasional public contact, and occasional contact with coworkers and supervisors ("defined as . . . be[ing] in the same building, but not side-by-side . . . ."). (AR 44.) The VE testified that such a person would be able to perform the jobs identified in response to the first hypothetical. (AR 44.)

The ALJ asked the VE a third hypothetical question considering the same person with the same capabilities and limitations as outlined in the second hypothetical, but who can have no contact with the public, coworkers, or supervisors. (AR 44.) The VE testified that there would be no available work for such a person. (AR 44.)

The ALJ posed a fourth hypothetical question considering the same person outlined in the second hypothetical—who is limited to occasional contact with the public, coworkers, and supervisors and who will be absent approximately four days per month. (AR 45.) The VE testified that there would be no available work for such a person. (AR 45.)

**D.     The ALJ's Decision**

In a decision dated June 19, 2015, the ALJ found that Plaintiff was not disabled. (AR 9-18.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920. (AR 9-11.) The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date, May 22, 2013. (AR 11.)

At Step Two, the ALJ found that Plaintiff had the severe impairments of bipolar disorder with psychotic features and alcohol abuse in reported remission. (AR 11.) The ALJ further found, however, that Plaintiff's other mental impairments were not severe. (*See* AR 11-12.) At Step Three, the ALJ determined that Plaintiff had the RFC

> to perform a full range of work at all exertional levels but with the
> following nonexertional limitations: she can perform simple

> routine tasks. She can have occasional contact with the public. She can have occasional contact with coworkers and supervisors, which was defined as working in the same building, but not side-by-side.

(AR 12.) In determining Plaintiff's RFC, the ALJ specifically considered Plaintiff's hearing testimony, the third party statements by Plaintiff's mother and aunt, and the medical evidence, including the opinions of consultative psychologist Dr. Portnoff, treating psychiatrist Dr. Mozaffari, and state agency psychologists Dr. Bilik and Dr. Jacobs. (AR 13-16.) The ALJ ultimately found, given Plaintiff's RFC, that she was not disabled because she could perform jobs that existed in significant numbers in the national economy. (AR 17.) Specifically, the ALJ found that Plaintiff could perform the jobs of landscape specialist, cleaner II, and janitorial. (AR 18.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on November 7, 2016. (AR 1-4.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

**E.      Plaintiff's Appeal**

On January 11, 2017, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. (Doc. 1.) Plaintiff claims that the ALJ erred in discrediting the opinion of consultative psychologist Lance Portnoff, Ph.D. and the third-party statements of Plaintiff's mother and aunt. (Doc. 13 at 13-17.)

**III.      SCOPE OF REVIEW**

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198

(9th Cir. 2008).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.     APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20

13

C.F.R. 404, Subpart P, App. 1.  *Id.* §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work.  *Id.* §§ 404.1520(f), 416.920(f).  If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.    DISCUSSION

In her Opening Brief, Plaintiff contends that the ALJ erred in discrediting the opinion of consultative psychologist Lance Portnoff, Ph.D., and the third party statements of Plaintiff's mother and aunt.  (Doc. 13 at 13-17.)

**A.    Consideration of the Medical Opinion of Lance Portnoff, Ph.D.**

In his consultative psychological examination of Plaintiff in 2012, Dr. Portnoff opined, in pertinent part, that Plaintiff had marked limitations in her ability to interact with coworkers and the public due to a mood disorder, maintain regular attendance in the workplace due to episodes of acute mania, and complete a normal workday without interruptions from a psychiatric condition.  (AR 314.)  The ALJ considered Dr. Portnoff's opinion and ultimately afforded it "little weight because it was inconsistent with the medical record that showed no evidence of the frequency of manic episodes."  (AR 15.)  The ALJ further reasoned that "[t]he medical record showed the claimant was not fully compliant with medication treatment and she was stable with limited treatment."  (AR 15.)

Plaintiff challenges the ALJ's reasons for discrediting Dr. Portnoff.  Plaintiff assails the ALJ's reference to only "a single page of Dr. Mozaffari's October 28, 2013 initial clinical assessment of Plaintiff" to support the conclusion that the medical record showed no evidence of the frequency of manic episodes.  (Doc. 13 at 14.)  Plaintiff contends, rather, that the record contains sufficient evidence from treating physicians regarding Plaintiff's "rapid cycling bipolar disorder symptoms."  (Doc. 13 at 16.)  Plaintiff also contends that Plaintiff had failed to take her

medications only on occasions when she was unable to afford refills, and that she continued experiencing symptoms despite medication compliance. (Doc. 13 at 16.)

### 1. Legal Standard

The ALJ must consider and evaluate every medical opinion of record. *See* 20 C.F.R. § 404.1527(b) and (c) (applying to claims filed before March 27, 2017); *Madrigal v. Berryhill*, No. CV 16-8714-E, 2017 WL 3120257, at *3 (C.D. Cal. Jul. 21, 2017). In doing so, the ALJ "cannot reject [medical] evidence for no reason or the wrong reason." *Madrigal*, 2017 WL 3120257, at *3 (quoting *Cotter v. Harris*, 642 F.2d 700, 706–07 (3d Cir. 1981)). Nor can the ALJ make his or her own lay medical assessment. *See Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (a hearing examiner not qualified as a medical expert should not make his or her own exploration and assessment of a claimant's medical condition) (citation omitted).

Cases in this circuit distinguish between three types of medical opinions: (1) those given by a physician who treated the claimant (treating physician); (2) those given by a physician who examined but did not treat the claimant (examining physicians); and (3) those given by a physician who neither examined nor treated the claimant (non-examining physicians). *Fatheree v. Colvin*, No. 1:13-cv-01577-SKO, 2015 WL 1201669, at *13 (E.D. Cal. Mar. 16, 2015). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citations omitted); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) ("By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." (citing 20 C.F.R. § 404.1527)). The opinions of treating physicians "are given greater weight than the opinions of other physicians" because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (citations omitted).

### 2. The ALJ Stated Sufficient Reasons for Rejecting Dr. Portnoff's Opinion.

It is uncontested that Dr. Portnoff only examined Plaintiff, and thus is considered a non-treating examining physician. (*See, e.g.*, AR 14, 15; Doc. 13 at 14; Doc. 14 at 3.) "[T]he

Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician." *Lester v. Chater*, 81 F.3d 821, 830 (quotation marks and citations omitted). "[T]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830-31 (citation omitted). Nonetheless, "[t]he ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012) (quoting *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).

The ALJ cited three reasons for affording "little weight" to Dr. Portnoff's opinion: (1) his opinion about the frequency of Plaintiff's manic episodes conflicted with the medical record; (2) the medical record showed Plaintiff was not fully compliant with medication and treatment; and (3) Plaintiff was stable with limited treatment. (AR 15.) These reasons are specific and legitimate, and are supported by substantial evidence in the record.

### a.     Objective Medical Evidence

Dr. Portnoff's opinion about the frequency of Plaintiff's manic episodes was inconsistent with that of the treating and state agency physicians. Where there are contradicting opinions, as is the case here, the ALJ is charged with resolving the conflict, which he did by affording more weight to the medical evidence of the treating physicians and the opinions of the state agency physicians than Dr. Portnoff. *See Cookson v. Comm'r of Soc. Sec.*, No. 2:12-cv-2542-CMK, 2014 WL 4795176, at 4 (E.D. Cal. Sept. 25, 2014); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) ("The ALJ is responsible for determining credibility, resolving conflicts in the medical testimony, and for resolving ambiguities. We must uphold the ALJ's the ALJ's decision where the evidence is susceptible to more than one rational interpretation."); *Corn v. Astrue*, No. 1:11–cv–00888 AWI GSA, 2012 WL 2798802, at *13 (E.D. Cal. July 9, 2012) ("To the degree there are conflicts in the medical evidence, it is the ALJ's responsibility to resolve such conflicts." (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989))); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[A]n ALJ may discredit treating physicians' opinions that are . . . unsupported by the record as a whole . . . or by

objective medical findings." (citations omitted)); *Mitchell v. Astrue*, No. ED CV 09-1258-PLA, 2010 WL 1994695, at *4 (C.D. Cal. May 14, 2010) ("The inconsistency of [the physician's] opinion with the objective [test] results and the medical evidence as a whole was a legitimate reason supported by substantial evidence for the ALJ to discredit the doctor's opinion." (citing 20 C.F.R. § 404.1527(d)(4))).

Dr. Portnoff opined that Plaintiff had marked limitations in her ability to interact with coworkers and the public due to a mood disorder, maintain regular attendance in the workplace due to episodes of acute mania, and complete a normal workday without interruptions from a psychiatric condition. (AR 314.) However, a year and a half after Dr. Portnoff issued his opinion, state agency psychologist Dr. Bilik found that Plaintiff was only moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. (AR 58.) Dr. Bilik explained that Plaintiff "can adapt" and "can interact appropriately with others, but may benefit from reduced interactions with the public." (AR 59.) Three months later, Dr. Bilik's opinion was endorsed and affirmed. (AR 71.)

As the ALJ noted, the medical evidence also failed to support Dr. Portnoff's opinion. Treatment notes from August to September 2013, state that Plaintiff did "not require specialty psychiatric care for maintaining adequate functioning. (AR 414.) Plaintiff reported hearing voices once every two weeks, but also admitted that she had not been taking her medication. (AR 432.) While complying with her medications, Plaintiff consistently reported no longer experiencing violent episodes, mood swings, or suicidal and homicidal ideation. (*See*, *e.g.*, AR 337, 404, 406, 409, 411, 440, 447, 453, 456.) In October 2013, Plaintiff reported that she had begun hearing voices *for the first time in months* as a result of running out of her medications. (AR 399.) Based on this conflicting medical evidence and the conflicting medical opinions, the ALJ properly discounted Dr. Portnoff's opinion.

### b.     Noncompliance with Treatment

The Court further finds that the inconsistency between Plaintiff's failure to adhere to her treatment regime, on one hand, and Dr. Portnoff's opinion, on the other hand, is also a valid specific and legitimate reason to reject Dr. Portnoff's opinion.

It was reasonable for the ALJ to conclude that Dr. Portnoff's opinion of Plaintiff's limitations was undermined by the evidence that Plaintiff "was not fully compliant with medication treatment." (AR 15.) On several occasions, Plaintiff reported to her treatment providers that she had not been taking her medications because could not afford the refills or because the medication was not working. (AR 399, 450.) On one occasion in particular, a physical therapist instructed Plaintiff "to not wait for refills until [the] last pill or after she runs out, but to come in [one week] . . . before running out." (AR 411.) However, in October 2014, Plaintiff admitted to Dr. Mouavangsou that she generally does not take her medications, and that she had not reported this to her primary care providers. (AR 432.)

Plaintiff also failed to undergo necessary laboratory tests. In May 2014, Dr. Mozaffari noted that Plaintiff had failed to undergo tests he previously ordered to assess hyponatremia related to lethargy. (AR 440.) Four months later, in September 2014, Dr. Mozaffari noted again that Plaintiff had failed to undergo the tests he had ordered. (AR 436.)

As the ALJ found, Plaintiff's lack of compliance with his treatment suggests that her symptoms may not have been as limiting as she alleged—and certainly not as limiting as Dr. Portnoff opined. *See also Cohn v. Berryhill*, No. 2:16-cv-07352-GJS, 2017 WL 4772398, at *4 (C.D. Cal. Oct. 20, 2017) (finding that the claimant's "unexplained failures to take prescribed hypertension and diabetes medication on a regular basis and to keep his appointments for medical tests, as well as Plaintiff's conservative treatment despite his allegedly disabling symptomatology are clear and convincing reasons for discounting Plaintiff's reported symptoms"). Moreover, the fact that Plaintiff reported no longer experiencing certain symptoms, and that her mood was assessed as "okay" during these periods of noncompliance with her medications, further indicates that her symptoms were less limiting than Dr. Portnoff opined. *See*, *e.g.*, *Vongdeng v. Colvin*, 2:15-cv-1071-CKD, 2016 WL 3126121, at *4 (E.D. Cal. Jun. 2, 2016) (finding that the ALJ properly discredited treating physician's opinion where it was undermined by Plaintiff's history of noncompliance with treatment and Plaintiff's simultaneously improved symptoms). Given Plaintiff's noncompliance with medications and treatment, the ALJ properly discounted Dr. Portnoff's opinion.

### c.     Improved Symptoms

Finally, the ALJ pointed to Plaintiff's improved symptoms as a basis for rejecting Dr. Portnoff's opinion.  Medical improvement constitutes a clear and convincing reason for rejecting a medical opinion.  *Morales v. Astrue*, 300 F. App'x 457, 459 (9th Cir. 2008); *see also Thacker v. Comm'r of Soc. Sec.*, No. 1:11-cv-00613-LJO-BAM, 2012 WL 1978701, at *11 (E.D. Cal. May 31, 2012) (finding evidence that plaintiff's medical condition was improving was a clear and convincing reason for rejecting medical opinion testimony).

In early 2013, as Plaintiff's symptoms were worsening with medication, treating physicians at the Fresno County Department of Behavioral Health adjusted her medications. (AR 339, 341.)   Over the subsequent months, Plaintiff's symptoms generally improved— particularly when she complied with her medications.  In June 2013, Plaintiff reported that she was no longer experiencing manic symptoms, and she was continued on her current medication. (AR 337.)   On several occasions between August and October 2013, Plaintiff admitted that medication had improved her symptoms.   (AR 411, 404, 406, 409.)   In November 2013, Plaintiff admitted that her symptoms remained improved as a result of medication, despite minor side effects.   (AR 456.)   In December 2013, Plaintiff reported "feeling better" and walking "for fun" once a day.  (AR 453.)  In March 2014, Plaintiff reported that she had been complying with her medications and "feeling great." (AR 447.)  In April 2014, Plaintiff again admitted that the medications were helping her mood.  (AR 444.)  In September 2014, Plaintiff reported that her mood was well controlled with the current medication.  (AR 436.)  Finally, in February 2015, Plaintiff stated that she had complied with her medications and that she had not experienced any major stressors or triggers.  (AR 417.)  Accordingly, the ALJ correctly cited Plaintiff's improved symptoms as contributing to his reason for discrediting Dr. Portnoff's opinion.

In summary, the Court finds that each of the ALJ's stated bases for discrediting Dr. Portnoff's opinion regarding Plaintiff's limitations are supported by substantial evidence.

### B.     Consideration of the Third-Party Lay Witness Statements.

The ALJ considered third-party lay witness statements submitted by Plaintiff's mother,

Eva Rodriguez, and Plaintiff's aunt, Shirley Mitchell, which described Plaintiff's limitations in performing daily activities, and the ALJ afforded them "only some weight." (AR 16.) The ALJ found that (1) the statements were inconsistent with the medical evidence and medical opinions; (2) Plaintiff's mother and aunt "lacked the medical training necessary to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms or the frequency or intensity of unusual moods or mannerisms"; and (3) Plaintiff's mother and aunt "would tend to be colored by affection for [Plaintiff] and a natural tendency to agree with the symptoms alleged by [Plaintiff]," given their relationship. (AR 16.)

Plaintiff contends that the ALJ's reasons for affording only some weight to the statements of Plaintiff's mother and aunt are insufficient. (Doc. 13 at 15.) In particular, Plaintiff contends that a witness's familial relationship to the claimant or lack of medical training are not permissible reasons under agency regulation for rejecting lay witness statements. (Doc. 13 at 16.)

Lay witness testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2010). Lay witness testimony cannot be disregarded without comment. *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). In rejecting lay witness testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. *Lewis*, 236 F.3d at 512.

Here, the ALJ found that the lay witness statements of Ms. Rodriguez and Ms. Mitchell were inconsistent with the medical evidence and medical opinions. (AR 16.) The ALJ may reject statements made by other sources when they conflict with a claimant's abilities. *See Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1163-64 (9th Cir. 2008); *see also* SSR 06-3p, 2006 WL 2329939, at *4 (the ALJ may consider "how consistent the opinion is with other evidence"). In July 2013, Ms. Rodriguez reported that Plaintiff's mood swings, depression, anger, and violent outburst had worsened over the prior six months. (AR 223.)

This, however, conflicted with the medical evidence. A month earlier—in June 2013—Dr. Snider noted that Plaintiff was no longer experiencing mood swings, violent episodes, or homicidal and suicidal ideation since her medications were adjusted. (AR 337.) In January 2015, Ms. Mitchell reported limitations, which similarly conflicted with the medical evidence and opinions. Ms. Mitchell reported that Plaintiff often exhibits rage, and that she was unable to hold a job. (AR 259.) However, around the same time, Plaintiff reported to Dr. Mozaffari that she had not been experiencing any major stressors or triggers. (AR 417.) As set forth above, the state agency psychologists also opined that Plaintiff could hold a job. *See supra* Part V.A.2.a. The ALJ's finding that these lay witness statements were inconsistent with the evidence in the record was a germane reason for rejecting them. *See*, *e.g.*, *see also Bettis v. Colvin*, 649 Fed. Appx. 390 (9th Cir. 2016) (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005); *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009)) (finding that contradictory medical evidence is a germane reason for rejecting lay witness testimony); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999), amended by *Tidwell v. Apfell*, No. 97–35863, 1999 WL 27525 (9th Cir. Jan. 26, 1999) (explaining contradictory medical evidence and testimony about claimant's activities are clear and convincing reasons for rejecting testimony of law witness); *see also Gonzales v. Astrue*, No. 1:10-cv-00657-SKO, 2011 WL 4500838, at *25 (E.D. Cal. Sep. 27, 2011) ("The Court is not tasked with considering the persuasiveness of the ALJ's reasons for rejecting third-party statements; rather, the Court reviews whether the ALJ provided reasons for rejecting the third-party statements that were germane to that witness.").

Additionally, the ALJ's finding that the close relationship between the two lay witnesses (Plaintiff's mother and aunt) and Plaintiff would color their statements was a germane reason for doubting the credibility of Ms. Rodriguez and Ms. Mitchell. *See Greger v. Barnhart*, 464 F.3d 968 (9th Cir. 2006) (finding that the ALJ's reasons for doubting the credibility of plaintiff's girlfriend were germane where the ALJ considered the close relationship and that the girlfriend was possibly "influenced by her desire to help him"). Therefore, the ALJ provided sufficiently germane reasons for discrediting the third-party statements of Plaintiff's mother and

aunt.

## VI.  CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is, therefore, AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff Tammy Busby.

IT IS SO ORDERED.

Dated:   __April 16, 2018__                    _____/s/ *Sheila K. Oberto*_____
                                                            UNITED STATES MAGISTRATE JUDGE